**SAFEGUARD MUTUAL INSURANCE COMPANY,**

v.

**Robert A. MILLER, William J. Kuntz, Charles D. Cowley, David P. Trulli, Frederic G. Antoun and Glenn A. Wenrich.**

**C. M. CLARK INSURANCE AGENCY, INC.**

v.

**Robert A. MILLER, William J. Kuntz, Charles D. Cowley, David P. Trulli, Frederic G. Antoun and Glenn A. Wenrich.**

**Civ. A. Nos. 71–767, 71–822.**

United States District Court, E. D. Pennsylvania.

July 13, 1978.

Oscar N. Gaskins, Philadelphia, Pa., for plaintiffs.

J. Justin Blewitt, Jr., Deputy Atty. Gen., Harrisburg, Pa., for defendants.

## OPINION

DITTER, District Judge.

Safeguard Mutual Insurance Co. and its affiliate, C. M. Clark Insurance Agency, Inc., brought this civil rights action to redress injuries arising from an alleged conspiracy by various employees of the insurance department of the Commonwealth of Pennsylvania. The defendants currently before the court are Frederick Antoun, a deputy attorney general in Pennsylvania who represented the insurance department from the mid-1950's to June, 1971; David Trulli, an assistant attorney general assigned to the insurance department from

September, 1965, until October, 1967, and a deputy insurance commissioner from October, 1967, to August, 1971; Charles D. Cowley, an assistant attorney general serving as an associate counsel in the insurance department from 1967 to 1973; and Glenn Wenrich, who was employed by the insurance department as an insurance company examiner at all times relevant to this suit.

The case is brought pursuant to 42 U.S.C. §§ 1981 through 1988, and jurisdiction is based on 28 U.S.C. §§ 1343 and 1332. The facts alleged in the complaint were succinctly summarized by the Court of Appeals for the Third Circuit as follows:

> [A]cting under color of Pennsylvania law, the defendants and other unknown parties entered into a conspiracy in violation of 42 U.S.C. §§ 1981–88 to deprive Safeguard and Clark of constitutionally protected rights; that acting in bad faith, willfully and maliciously, but under color of state law, they caused a false report of examination of each plaintiff to be issued; caused a suspension order to be issued arbitrarily, maliciously and without notice; improperly impounded plaintiffs' records; caused an ex parte restraining order to be issued; caused a Petition for Liquidation to be issued; and much more, all to plaintiffs' damage.

472 F.2d 732, 732–33 (3rd Cir.).

This litigation has had an extremely complex history. Two defendants, not now involved in the instant suit, were sued in other districts, producing extensive court opinions. *C. M. Clark Insurance Agency, Inc. v. Maxwell,* 156 U.S.App.D.C. 240, 479 F.2d 1223 (1973); *C. M. Clark Insurance Agency, Inc. v. Reed,* 390 F.Supp. 1056 (S.D. Tex.1975). Both of these provide useful discussions of the relevant facts and law. Furthermore, they may have collateral estoppel ramifications beyond their obvious precedential value.[1]

Meanwhile, the case has been pursued in this district for quite a long time. Our late Chief Judge, John Lord, issued an opinion in 1971 dismissing as to all defendants on the ground that their acts were within the ambit of governmental immunity. The chief judge found that the defendants had acted in good faith, and were therefore entitled to this immunity. He also expressed some doubt as to whether a showing of good faith was even necessary. *Safeguard Mutual Ins. Co. v. Miller,* 333 F.Supp. 822 (E.D.Pa.1971).

This decision was reversed by the Court of Appeals, which held that a Rule 12(b)(6) motion was not a proper vehicle for deciding a governmental immunity question. Rather, the court said, a record must be developed on the scope of defendants' authority and discretion in order to determine whether they should be immune from liability under the civil rights laws. Furthermore, the court said that a record was also needed before dealing with the defense of good faith. 472 F.2d 732 (3d Cir. 1973). The Court of Appeals remanded in order that such a record could be developed. I was assigned the case at this point on transfer.

In an opinion dated March 31, 1975, reported at 68 F.R.D. 239, I noted that the parties had now submitted extensive affidavits, thereby creating an adequate record on the scope of authority question. Information was still lacking, however, as to good faith. This aspect of the case had become particularly important in light of case-law developments subsequent to 1973. At that time, in its remand opinion, the Court of Appeals had treated good faith simply as a defense, wholly separate and apart from the issue of immunity. In 1974, however, the Supreme Court effected a marriage of the two by holding that a showing of good faith is necessary in order for executive immunity to attach. *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974). This was adopted by the Third Circuit in *Goode v. Rizzo,* 506 F.2d 542 (3d Cir. 1974). The *Goode* decision was reversed by the Su-

---

1. By agreement of counsel, I dismissed two additional defendants, Robert A. Miller and William J. Kuntz, with prejudice.

preme Court in 1976, but the reversal was on other grounds.[2]

In order to create a complete record, therefore, I ordered a hearing at which the parties presented evidence on the defendants' good faith, and additional briefs were thereafter submitted on this question. I then ordered the plaintiff to file "proposed findings setting forth each specific act of each defendant which violated a constitutional right of the plaintiff, together with a supporting brief . . . ." These proposed findings were submitted, together with the defendants' response. My order further provided that "[a]s to each of the proposed findings referred to in paragraph 1 hereof, it has been agreed by counsel that the court shall decide whether or not each defendant was protected by an unqualified immunity."

Currently before me is the defendants' motion for summary judgment. They assert that they are prosecutors, and as such they are entitled to absolute immunity for all their acts in connection with this matter. The Supreme Court recently recognized such an immunity for prosecutors in *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

The *Imbler* suit involved the felony murder prosecution of the plaintiff in connection with a grocery store robbery. Following Imbler's conviction, new evidence was discovered which cast serious doubt on the credibility of the prosecution's chief identification witness. The plaintiff first sought his release in the state courts, but was unsuccessful. He then petitioned the federal courts for a writ of habeas corpus. The District Court granted the writ based on its finding of prosecutorial misconduct in the culpable use of false or misleading testimony and the suppression of evidence favorable to the defense. 424 U.S. at 414–15, 96 S.Ct. at 987. The Ninth Circuit affirmed

and the plaintiff was released after some nine years of incarceration.

The newly-freed plaintiff then brought an action under Section 1983 against prosecutor Pachtman and several police officers, alleging a conspiracy to convict him. He claimed that Pachtman had both intentionally and negligently allowed the identification witness to give false testimony as found by the district court and that the suppression of evidence was also "chargeable" to Pachtman. Furthermore, Imbler charged that Pachtman had known of a lie detector test which "cleared" the plaintiff and that he used an artist's sketch which had been altered to resemble the plaintiff.

The District Court dismissed the complaint under Rule 12(b)(6) and the Ninth Circuit affirmed, finding that Pachtman's alleged acts were committed, "during prosecutorial activities which can only be characterized as an 'integral part of the judicial process.'" 500 F.2d 1301, 1302 (9th Cir. 1974), quoting *Marlowe v. Coakley,* 404 F.2d 70 (9th Cir. 1970). The Supreme Court granted certiorari "to consider the important and recurring issue of prosecutorial liability under the Civil Rights Act." 424 U.S. at 417, 96 S.Ct. at 988.

Although it had recently recognized a qualified immunity under Section 1983 for a state governor, *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and state school officials, *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Court said that these decisions did not necessarily control the instant case. Rather, the question depends on the immunity granted the relevant official at common law and the interests underlying it. After reviewing the relevant authority, the Court concluded that at common law, prosecutorial immunity was clearly absolute. 424 U.S. at 424, 96 S.Ct. at 992. The reason underlying this immunity was the public's

---

**2.** The action in *Goode* was brought against city officials on the theory that they had failed to correct a pattern of constitutional violations by Philadelphia police officers. The district court granted broad equitable relief, 357 F.Supp. 1289, and the Court of Appeals affirmed, 506 F.2d 542. The Supreme Court ruled, however,

that such relief was not available in the absence of active and affirmative conduct on the part of the defendants. The opinion does not address the good faith qualification of governmental immunity, and thus appears to leave it intact. *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).

interest in having vigorous prosecutors free from fear of liability for the consequences of their official acts. The Court pointed out that the threat of litigation could cause the prosecutor to shade or alter his decisions instead of exercising independent judgment, and harassment from frivolous litigation would divert his attention from his public duties.

The *Imbler* court then concluded that the same public policy considerations required absolute immunity for prosecutors under Section 1983. 424 U.S. at 427, 96 S.Ct. at 993. Noting that the threat of Section 1983 suits would have the same damaging effects as potential common law liability, the Supreme Court went on to hold that a *qualified* immunity would not be adequate. "It is fair to say, we think, that the honest prosecutor would face greater difficulty in meeting the standards of qualified immunity than other executive or administrative officials. Frequently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation. Defending these decisions, often years after they were made, could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials." 424 U.S. at 425, 96 S.Ct. at 992–93.

The plaintiff here argues, however, that the defendants in the present suit are not prosecutors at all, and are thus not shielded by prosecutorial immunity. A prosecutor, I am told, ordinarily presents factual material to grand juries or to finders of fact at criminal trials. It is asserted that very little of defendants' wrongful conduct is alleged to have occurred during the pursuit of such activities.

■ I agree with plaintiff's argument as to defendant Glenn A. Wenrich. In his affidavit, submitted to detail the scope of his authority and duties, Wenrich states that he is employed as an insurance company examiner. Attached to the affidavit is the class specification of the Office of Administration of the Commonwealth of Pennsylvania, which gives a complete job de-

scription for Wenrich's position. The specification defines the duties of an insurance company examiner as "advanced technical auditing and accounting work in the examination of the operations and financial conditions of insurance companies . . . Work involves examining records, auditing company statements, and preparing reports to assure that insurance company operations and financial conditions adhere to insurance laws, rules, and regulations." The specification also offers the following examples of work performed:

Examines, verifies, and analyzes fiscal data and records of insurance companies for adherence to state laws, rules, and regulations.

Makes extensive test checks of income and disbursement items and accounts.

Prepares statements of income and disbursements, assets and liabilities, underwriting and investment exhibits, and necessary supporting schedules such as summaries of the investment accounts and analysis of the surplus accounts.

Examines claims to determine settlements are made in accordance to policy provisions for proper treatment of policyholders.

Reviews insurance policy forms, riders, and endorsements to determine compliance with established standards and procedures.

Examines accounting procedures used to determine handling and control of receipts and disbursements.

Determines that ample reserves are included in company balance sheets to cover all liabilities.

Determines that securities owned are permissible investments and reconciles reserves during period covered by examination.

Prepares detailed reports of audits and examinations and makes recommendations for corrective measures.

Performs related work as required.

Clearly, these duties are purely investigatory in nature, and they bear no resemblance to actual prosecutorial activities.

Indeed, in his affidavit, Wenrich states that after completing his examination and making his report to the deputy insurance commissioner, he "had no further contact with Safeguard other than to later testify" at trial. As will be seen shortly, prosecutors themselves are not entitled to absolute immunity when they are engaged in investigatory activities. It cannot be argued then that one whose *only* function is to investigate and report could be afforded a higher degree of protection.

Moreover, in holding that prosecutors are entitled to a higher degree of immunity than other executive officials, the Supreme Court in *Imbler*, supra, explained that "[f]requently acting under serious constraints of time and even information, a prosecutor inevitably makes many decisions that could engender colorable claims of constitutional deprivation." 424 U.S. at 425, 96 S.Ct. at 992–93. By contrast, there has been no showing that Wenrich was called upon to make decisions while acting under constraints of time or information.

For these reasons, I conclude that defendant Wenrich is not a "prosecutor" and he is entitled only to the qualified immunity enjoyed by other executive officials. He must, therefore, establish that his actions were in good faith in order to be free from liability. See *Scheuer v. Rhodes*, supra; *Wood v. Strickland*, supra.

■ A different result, however, is required as to defendants Antoun, Trulli, and Cowley. I am persuaded that the functions and duties of these defendants are such that they should be deemed prosecutors for the purpose of determining the degree of immunity to which they are entitled.

The affidavit of defendant Frederic G. Antoun states that at the time of the acts complained of, he was a deputy attorney general in the Commonwealth of Pennsylvania, classified as an "Attorney IV." He became involved in this case when he was assigned to represent the insurance department in defending the appeal from the suspension of Safeguard Mutual Insurance Company. The affidavit further states that the defendant's work as a deputy attorney general typically involved the conduct of litigation.

The class specification of the Office of Administration of the Commonwealth of Pennsylvania, attached to Antoun's affidavit, gives further details regarding the duties and authority of an "Attorney IV." This document states that "[w]ork usually involves conducting litigation of considerable importance and complexity, and may involve large sums of money and be directed against firms represented by legal staff of more than average ability." While some of the duties of an Attorney IV are nonprosecutorial, such as supervising subordinate attorneys and rendering legal advice to various state departments, it is clear that a primary responsibility of a lawyer in this position is to conduct litigation in the name of the Commonwealth. Indeed, among the "Required Knowledges, Skills and Abilities" listed in the Attorney IV Class Specification are: "Thorough knowledge of judicial procedures and of the rules of evidence . . . Thorough knowledge of the methods and practices of pleading civil and criminal cases, and of effective techniques in the presentation of cases in court."

The affidavits of defendants Cowley and Trulli are similar. Charles D. Cowley was also an assistant attorney general classified as an "Attorney IV." His affidavit states that it was his function to represent the insurance department in litigation. Following the issuance of the Safeguard suspension order, Cowley was assigned the task of preparing a petition for dissolution and liquidation which he filed with the Court of Common Pleas of Dauphin County, sitting as Commonwealth Court.

David P. Trulli's affidavit states that on September 25, 1965, he was appointed to the position of special assistant attorney general, classified as an "Attorney I." Among other duties, it was his responsibility to "[a]ssist in preparing cases for trial by drafting pleadings and by assisting an attorney of higher rank in trial work in major civil or criminal cases; . . . [s]earch for, interpret, and apply laws, court decisions, and other legal authorities in prepa-

ration of briefs, pleadings, indictments, and other legal papers in connection with suits, trials, and other proceedings . . . ." In October of 1967, Trulli was appointed deputy insurance commissioner for services and enforcement. In this post, he was called upon to review complaints about insurance companies, direct investigations, conduct formal and informal hearings, and "[s]erve as prosecutor and state's witness in civil and criminal court actions." Following the Safeguard suspension order, Mr. Trulli was assigned to assist as co-counsel in the litigation.

These affidavits show that in the course of their employment, defendants Antoun, Cowley and Trulli were each engaged in a rather broad array of activities. Some of their tasks were necessarily administrative and investigative. Nevertheless, it is clear that all three defendants participated extensively in representing the Commonwealth in litigation, the purpose of which was to correct alleged abuses by insurance companies and to enforce the laws of the State. I hold that for the purposes of the immunity doctrine, they must be deemed "prosecutors."

The fact that the litigation conducted by these defendants was primarily civil rather than criminal is not significant. In the recent decision of *Butz v. Economou*, —— U.S. ——, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court addressed the immunity issue with regard to the actions of a Department of Agriculture attorney who presented evidence before an administrative hearing. The majority echoed the reasoning in *Imbler*, supra, and noted that the fear of liability might inhibit such agency attorneys in the performance of their duties. The Court made it clear that the immunity question should not turn on whether the proceeding is civil or criminal. "We can see no substantial difference between the function of the agency attorney in presenting evidence in an agency hearing and the function of the prosecutor who brings evidence before a court." —— U.S. at —— —— ——, 98 S.Ct. at 2916.

The public's interest in free and vigorous prosecutors is most certainly at stake here. Surely, the insurance industry has an enormous impact on the daily lives of the public, and laws regulating the industry are essential. It is well within the interests of the people of Pennsylvania that assistant attorneys general who conduct litigation aimed at enforcing those laws be free to do so without the crippling fear of civil liability.

Another point raised by defendants also warrants some discussion at this juncture. In response to the plaintiffs' contention that Antoun, Cowley and Trulli are not prosecutors at all, the defendants argue that this was already resolved in an action to which the plaintiffs were parties, and the doctrine of collateral estoppel therefore bars relitigation of the same question here. The action to which defendants refer is *C. M. Clark Insurance Agency, Inc. v. Reed*, 390 F.Supp. 1056 (S.D.Tex.1975), a case that arose from the same transactions and occurrences as the instant suit. George F. Reed was at all relevant times either chief counsel to the insurance department or insurance commissioner for the State of Pennsylvania. He was originally named as a defendant here, but was dismissed for lack of personal jurisdiction along with David Maxwell, Reed's predecessor as insurance commissioner. Suit was then filed against Maxwell and Reed in their new domiciles, Washington, D. C. and southern Texas, respectively.

In a lengthy and detailed opinion, the District Court in Texas held that defendant Reed was acting as a prosecutor in both his capacities of chief counsel and insurance commissioner. In light of this holding, a strong argument can be made in support of the position that plaintiffs are estopped from denying the defendants' status as prosecutors. The fact that we are dealing with different defendants here is not necessarily fatal. In *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Supreme Court held that a patentee who prosecutes a claim on his patent and *loses* is precluded from suing a *different* defendant on the same claim la-

ter. While its holding was confined to the narrow area of patent law, the Court took the opportunity to soundly criticize the aging doctrine of mutuality-of-estoppel. The mutuality rule dictates that unless *both* parties in an action are bound by a prior judgment, *neither* can use it as determinative of an issue. This, noted the Court, was of dubious utility. "Authorities differ on whether the public interest in efficient judicial administration is a sufficient ground in and of itself for abandoning mutuality, but it is clear that more than crowded dockets is involved. The broader question is whether it is any longer tenable to afford a litigant more than one full and fair opportunity for judicial resolution of the same issue." 402 U.S. at 328, 91 S.Ct. at 1442 (footnote omitted). After a lengthy discussion of special considerations in patent cases, the Court then answered this question in the negative, overruling its previous decision in *Triplett v. Lowell*, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936).

Although the *Blonder-Tongue* decision was written in a patent-law context, its principles seem to be generally applicable where collateral estoppel is an issue. Since defendant Reed was found to be a prosecutor, defendants here argue that plaintiffs have had their day in court and the question cannot be relitigated. It is important to note, however, that while defendant Reed in the Texas case held the positions of general counsel and then insurance commissioner, the defendants now before me occupied subordinate positions as assistant counsels. The court's decision in the Texas case can be read as confining its holding to Reed's positions alone. "Because these activities are all part of the traditional prosecutorial role, the court finds that they were within the scope of the defendant's official function *while he was serving as Chief Counsel to the Pennsylvania Insurance Commissioner.*" 390 F.Supp. at 1062 (emphasis added). Since the defendants in the respective cases hold different positions, therefore, it can be argued that *Blonder-Tongue* does not apply and collateral estoppel is not a bar.

Nevertheless, this interpretation would probably be too narrow a reading of the Texas decision. The defendants' activities in the case before me are substantially the same as those of defendant Reed, and it would be difficult to conclude that he was a prosecutor while Antoun, Cowley and Trulli were not. In any event, since I am persuaded on the merits that all these defendants are prosecutors for immunity purposes, the resolution of the collateral estoppel issue does not affect the outcome of the instant suit.

█ My holding that Antoun, Cowley and Trulli are prosecutors, however, does not resolve the issue concerning the degree of immunity to which they are entitled. On the contrary, recent case law supports the conclusion that while prosecutors are shielded by an absolute immunity when they are engaged in *prosecutorial* activities, their immunity is reduced to one qualified by the requirement of good faith when they pursue investigative functions.

An examination of this case law must begin once again with *Imbler v. Pachtman*, supra. As discussed above, *Imbler* is the leading case establishing the prosecutor's absolute immunity. In setting boundaries to its opinion, the *Imbler* court observed that the Ninth Circuit had distinguished between purely prosecutorial functions on the one hand and investigatory or administrative duties on the other, finding that the latter were entitled only to a qualified immunity. The Supreme Court would not go so far, however. It held only that the challenged activities of the prosecutor in the case before it "were intimately associated with the judicial phase of the criminal process," and were thereby shielded with an absolute immunity. The court stated it did not need to decide at this juncture whether an absolute immunity was necessary with regard to the prosecutor's investigatory or administrative role. Thus, *Imbler* left open the question as to how far the prosecutor's absolute immunity would extend, and to my knowledge, the Supreme Court has not addressed the issue since.

The Third Circuit has dealt with this question in several recent opinions. *Brawer v. Horowitz*, 535 F.2d 830 (3d Cir. 1976), decided a few months after *Imbler*, held that the *Imbler* immunity for a state prosecutor in a section 1983 suit was equally applicable to a federal prosecutor sued in a *Bivens*-type action.[3] The court restricted its holding, however, by stating that this absolute immunity would attach "where the allegations relate solely to his initiating and presenting a criminal case." 535 F.2d at 834.

This foreshadowed the Third Circuit's subsequent holding in *Helstoski v. Goldstein*, 552 F.2d 564 (3d Cir. 1977). Plaintiff Helstoski was a former Congressman from New Jersey who sued the United States Attorney for allegedly engaging in a systematic campaign to discredit the plaintiff and destroy his career. The complaint charged that the prosecutor abused the grand jury process, leaked false information to the press, and illegally seized bank records. 552 F.2d at 565. The defendant moved to dismiss, and the District Court granted the motion relying on *Imbler*. The Court of Appeals reversed, stating that the public policy considerations underlying the *Imbler* immunity doctrine did not apply with equal force to the allegations in the *Helstoski* complaint. The panel noted that there was still an open question as to whether absolute immunity extended to a prosecutor's investigative and administrative functions. Moreover, if the immunity was so extended, the court felt that some of the conduct alleged in the complaint went beyond the proper performance of even these aspects of a prosecutor's job. 552 F.2d at 566. Here, the court made particular reference to the allegation that the prosecutor had deliberately leaked false information to the press. "It would appear that such activity, if it occurred would lie outside of the rationale for absolute immunity set forth in *Imbler*. At most, it would be subject to a qualified good-faith immunity." 552 F.2d at 566. The *Helstoski* opinion

makes it clear therefore that there is some point at which a prosecutor's conduct can step beyond the boundaries of absolute immunity and be subject to liability under the test of good faith.

Far more decisive on the issue of good faith as opposed to absolute immunity is the decision of the Court of Appeals for the District of Columbia Circuit in *Briggs v. Goodwin*, 186 U.S.App.D.C. 179, 569 F.2d 10[4] (1977), cert. denied, —— U.S. ——, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978). By a divided panel, the *Briggs* court ruled that when a prosecutor is engaged in investigative rather than advocatory activities, he is entitled only to a qualified immunity, because the public policy considerations underlying the absolute immunity in *Imbler* no longer control. The court emphasized that a prosecutor's absolute immunity derives, not from his formal association with the judicial process, but from the fact that he exercises a discretion similar to that exercised by judges, and must be fully shielded in order to preserve the independence of that discretion. Furthermore, when a prosecutor functions in his purely prosecutorial role, " 'the circumstances typically provide alternative instruments of the judicial branch to check misconduct—the discretion of the grand jury, the procedures of a trial, and the potential sanction of discipline imposed by the court itself.' " 186 U.S.App. D.C. at 193, 569 F.2d at 24, quoting *Apton v. Wilson*, 165 U.S.App.D.C. 22, 33, 506 F.2d 83, 94 (1974). At least the first two of these checks are often absent when a prosecutor pursues his investigatory or administrative role.

The *Briggs* opinion was discussed by the Third Circuit in the case of *Jennings v. Shuman*, 567 F.2d 1213 (3d Cir. 1977). *Jennings* noted once again that *Impler* had left open the question of immunity for a prosecutor's investigative and administrative functions. Just as it had in *Helstoski*, the Third Circuit again expressly declined to answer the question since the facts before it

**3.** *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**4.** See also 186 U.S.App.D.C. 170, 569 F.2d 1.

did not require such a decision. While refusing to take a position on the "correctness" of *Briggs,* however, the Third Circuit pointed out that the *Briggs* dissent, as well as the general commentaries on immunity, indicated "a split of opinion." Id. at 1221, n. 15.

The court went on to recall its earlier opinion in *U.S. ex rel Rauch v. Deutsch,* 456 F.2d 1301 (3d Cir. 1972), wherein it was held that a prosecutor who allegedly arrested and prosecuted the plaintiff as part of a scheme to extort money was entitled to absolute immunity. The *Jennings* panel concluded that "[i]n light of *Helstoski,* we read *Rauch* as standing for the principle that a prosecutor is entitled to absolute immunity 'while performing his official duties,' id. at 1302, as an officer of the court, even if, in the performance of those duties, he is motivated by a corrupt or illegal intention." 567 F.2d at 1221–22.

Thus, while the Court of Appeals for the D. C. Circuit favors a qualified immunity for prosecutors when they engage in investigatory or administrative functions, the issue in this Circuit remains an open one. Nevertheless, nothing in *Jennings* causes me to question the holding of *Briggs.* The *Jennings* language reaffirming the vitality of absolute immunity was clearly limited to the situation where the defendant is pursuing purely prosecutorial activities. I am persuaded, therefore, that I should apply a good-faith qualified immunity to the investigative and administrative acts of Antoun, Cowley and Trulli. This conclusion is supported by the recent decisions of Chief Judge Lord and Judge VanArtsdalen of this district, both of whom followed *Briggs,* supra, and held that good-faith immunity applies to the non-prosecutorial functions of a prosecutor. *D'Iorio v. County of Delaware,* 447 F.Supp. 229 (E.D.Pa.1978); *J.D. Pflau-*

*mer, Inc. v. United States Department of Justice,* 450 F.Supp. 1125 (E.D.Pa.1978).[5]

On the basis of all the foregoing, I conclude that defendants Antoun, Cowley and Trulli are protected by an absolute immunity with regard to any of their acts which are prosecutorial in nature. On the other hand, conduct falling within the investigative and administrative functions of these defendants is subject to a qualified immunity and they must establish their good faith in order to escape liability. See *Helstoski v. Goldstein,* supra. Finally, those acts, if any, that fall completely outside the proper scope of defendants' authority and official function would be entitled to no immunity at all. Pursuant to this court's order, plaintiffs have submitted proposed findings of fact which state each specific act of each defendant that allegedly furthered the conspiracy to violate plaintiff's civil rights. My task is to decide which immunity classification is appropriate for each of these acts.

It would not be useful to discuss each of the proposed findings individually, since they are 198 in number, and they tend to be somewhat repetitious. Rather, in addressing this problem, I am guided by the analysis and conclusions of Judge Bue who decided the plaintiffs' case against defendant Reed in the Southern District of Texas. *C. M. Clark Insurance Agency v. Reed,* 390 F.Supp. 1056 (S.D.Texas 1975). Dealing with allegations that closely parallel those in the instant case, Judge Bue found in essence that the acts of which the plaintiffs complained could be divided into various categories of conduct. The complaint charged that the plaintiffs' civil rights had been violated by the acts of the defendant incident to issuing the suspension order of April 12, 1967 and commencing the prosecu-

---

**5.** See also, *Clark v. Lutcher,* 77 F.R.D. 415 (M.D.Pa.1977); *Daniels v. Kieser,* 446 F.Supp. 1160 (N.D.Ill.1978). I note that while the Supreme Court recently recognized absolute immunity for federal agency attorneys, there is nothing to indicate that this immunity is intended to include administrative or investigative acts. The Court held only "that an agency attorney who arranges for the presentation of

evidence on the record in the course of an adjudication is absolutely immune from suits based on the introduction of such evidence." *Butz v. Economou,* supra, —— U.S. at ——, 98 S.Ct. at 2916. The majority acknowledge that the question had been left open in *Imbler,* supra, but it did not express any intention to answer that question. —— U.S. at ——, n. 37, 98 S.Ct. 2894.

tion of Safeguard Mutual Insurance Co.; seeking an order from the Dauphin County Court and the United States District Court enjoining the company from transacting business and impounding its books and records; filing a petition for liquidation in the Court of Common Pleas; employing pre-trial discovery procedures and conducting the trial of *Commonwealth of Pennsylvania v. Safeguard Mutual Insurance Co.,* and filing exceptions to the court's ruling in that case. Judge Bue found that "these activities are all part of the traditional prosecutorial role," and absolute immunity attached, rendering the defendant "immune from liability for any cause of action arising from these activities." 390 F.Supp. at 1062.

As to three more categories of conduct, Judge Bue found that executive immunity was properly applicable. These included issuing press releases with regard to the suspension order; refusing to authorize certain expenditures of money; and authorizing examinations of the Safeguard company. The court concluded that the policy-making authority vested in defendant Reed both as insurance commissioner and as general counsel to the insurance department entitled him to executive immunity with regard to these activities, if he could establish that he had remained within the scope of his authority, and that he had acted in good faith. 390 F.Supp. at 1063. See *Scheuer v. Rhodes,* supra, 416 U.S. at 247, 94 S.Ct. at 1692. Judge Bue found that while these activities were clearly within the scope of the defendant's authority, there was insufficient evidence to determine whether Reed's acts had been taken in good faith. "Accordingly, resolution of this issue must await trial or the presentation of further evidence . . . .." 390 F.Supp. at 1064.

Finally, plaintiffs also alleged that the defendant had violated their rights by means of unconstitutional searches and the procurement of false testimony. The court concluded that " . . . trial of this matter must resolve whether these acts were in fact committed by the defendant, whether they fall within one of the above ambits of immunity and if subject to immunity, whether they were committed in good faith." 390 F.Supp. at 1064.

A similar analysis can be applied to the instant case. After examining the Proposed Findings of Fact submitted by the plaintiffs, I conclude that a number of the alleged civil rights violations charged therein arose from activities by the defendants which are shielded with absolute immunity. Proposed Findings Nos. 34, 35, 38, 39, 40, 44 and 57 allege civil rights violations occurring in the preparation and issuance of the Safeguard suspension order on April 12, 1967. Proposed Findings Nos. 45, 49, 54, 55, 56 and 59 charge violations arising from the defendants' participation in obtaining a court order enjoining the company from transacting business and impounding its books and records. The filing of a petition for liquidation with the Court of Common Pleas of Dauphin County is the subject of Proposed Findings Nos. 61, 62 and 63, and the use of pre-trial discovery procedures gave rise to the alleged violations in Nos. 150, 151 and 173. Finally, defendants are charged with violating plaintiffs' civil rights by their acts in conducting the trial of *Commonwealth of Pennsylvania v. Safeguard Mutual Insurance Company* in the Court of Common Pleas for Dauphin County and presenting the Commonwealth's case. See Nos. 36, 137–146, 161–164, 172, 176 and 192.

In the Texas litigation, Judge Bue found that substantially the same activities as those described above were "part of the traditional prosecutorial role [and] . . . within the scope of the defendant's official function." He therefore concluded that absolute immunity applied, and I agree with that conclusion. In *Imbler v. Pachtman,* supra, the Supreme Court found that absolute immunity was appropriate because the defendant's activities in procuring plaintiff's indictment and conducting his criminal trial "were intimately associated with the judicial phase of the criminal process, and thus were functions to which the reasons for absolute immunity apply with full force." 424 U.S. at 431, 96 S.Ct. at 995 (footnote omitted). The Court went on to

hold that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." Id. (footnote omitted). Similarly, in preparing and issuing the suspension order, seeking an injunction and an order of impoundment, filing a petition for liquidation, engaging in pretrial discovery, and conducting the trial of the Commonwealth's case, defendants Antoun, Cowley and Trulli were engaged in activities that were "intimately associated with the judicial phase of the [insurance company suspension] process . . . ." Id.

There is nothing to indicate that these activities are outside the scope of the defendants' official authority. Moreover, these are certainly "functions to which the reasons for absolute immunity apply with full force." The allegations with which we are concerned here do not extend beyond the initiation and presentation of the Commonwealth's case against the plaintiff insurance companies. The decisions regarding the initiation of such a case and the manner in which it will be presented must be made by vigorous prosecutors free from fear of civil liability for the consequences of their acts. I hold that these are traditional prosecutorial activities for which defendants Antoun, Cowley and Trulli are entitled to summary judgment on the ground that they are protected by an absolute immunity.

The same cannot be said, however, of the plaintiffs' other allegations. First, plaintiffs assert that their rights were violated by the defendants' acts in preparing the report of examination of the Safeguard Mutual Insurance Company. The report is alleged to contain numerous errors and misstatements. The allegations are contained in Proposed Findings of Fact Nos. 1–31, 33, 41–43, 64–67, and 69–76. Secondly, plaintiffs claim that their rights were violated by the defendants' actions in posting insurance company investigators on the plaintiffs' premises for an unreasonably long period of time and directing the activities of these investigators in such a way as to vex and harass the plaintiffs. See Proposed Findings Nos. 50, 51, 84–92, 95, 105, 114, 125, 165–169. Third, it is charged that defendants contacted banks and other financial institutions in order to freeze Safeguard's funds and prevent the company from managing its own financial affairs, all without authority or just cause. These charges are found in Proposed Findings Nos. 50, 53, 58, 122, 123, and 125. Fourth, Proposed Findings Nos. 60 and 77–83 charge that the plaintiffs' rights were violated by the defendants' issuance of press releases and communications with media representatives regarding the suspension and injunction orders. Fifth, Proposed Findings Nos. 121 and 126–135 allege that defendants unreasonably refused to authorize certain expenditures on the company's behalf. These included the payment of salaries and credit card bills, as well as various administrative expenses. Sixth, Proposed Findings Nos. 93, 96–104 and 107–113 charge that defendants directed uniformed police officers of the City of Philadelphia to position themselves on the plaintiffs' premises and to search persons entering or leaving the building, all in an alleged effort to harass plaintiffs and impede their business operations. Finally, Proposed Findings Nos. 116–120 and 124 charge that the defendants communicated with agents, brokers, and creditors of Safeguard, as well as with other insurance companies, for the purpose of informing these third parties that the company had been suspended because it was insolvent. This is said to have resulted in a loss of insurance protection as well as revenue.

The parties hotly contest the issue of whether these actions were within the proper scope of defendants' authority. Then existing legislative enactments authorized the investigation of the company, preparation of a Report of Examination, sending notice of the suspension to the company's creditors, issuing press releases concerning the suspension, and approval or disapproval of company expenditures. See 40 P. S. § 202. Authority to engage in any of the other above-mentioned acts may arguably be implied in the same statute, as well as in the insurance department's general respon-

sibility to protect the public. Nevertheless, plaintiffs argue persuasively that the limits of this authority would be far exceeded if the defendants willfully distorted the facts, and proceeded with an intention to harass the plaintiffs or to violate their civil rights.

The present record does not provide a basis for deciding this issue. Rather, it must be left for trial to determine whether the defendants actually committed these acts in the manner charged by the plaintiffs, and if so, whether the proper limits of defendants' authority were thereby exceeded.

Perhaps more importantly, the issue of good faith must also be determined. The acts with which we are concerned here involved investigating, reporting, communicating with creditors, informing the public, and monitoring financial affairs. Surely, these activities are investigative and administrative in nature, rather than prosecutorial. As discussed earlier, when a prosecutor performs investigative or administrative functions, he is entitled only to a qualified immunity, and he must establish his good faith in order to escape liability. See *Briggs v. Goodwin,* supra; *Helstoski v. Goldstein,* supra. Indeed, the same conclusion was reached by Judge Bue in the Southern District of Texas when dealing with the substantially parallel activities of defendant Reed. *C. M. Clark Insurance Agency v. Reed,* supra, 390 F.Supp. at 1062–64. Like Judge Bue, I conclude that the question of defendants' good faith as to all their investigative and administrative functions presents an issue of fact which can only be determined at trial. See also *Clark v. Lutcher,* supra.

In light of these outstanding issues of fact, therefore, the motion of defendants Antoun, Cowley and Trulli for summary judgment must be denied in so far as it pertains to their investigative and administrative activities.

Some consideration must also be given to the substance of Proposed Findings Nos. 136 and 191. Although parts of these proposed findings are vague, they clearly charge the defendants with intimidating and threatening witnesses, as well as misleading the court through false or irrelevant information. If the plaintiffs are alleging that defendants' conduct was aimed at altering the witnesses' testimony, their claim would amount to a charge of subornation of perjury. In *Hampton v. City of Chicago,* 484 F.2d 602 (7th Cir. 1973), cert. denied, 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974), the Court of Appeals for the Seventh Circuit held that such activity would clearly fall outside the scope of a prosecutor's quasi-judicial (absolute) immunity. 484 F.2d at 609, n. 9. Judge Bue in the Southern District of Texas interpreted this to mean that a prosecutor would be entitled to no immunity at all with regard to such an act. 390 F.Supp. at 1064. Once again, I hold that the issues of whether this conduct actually occurred at all, and if so, whether it is entitled to any immunity, must be determined at trial. Therefore, the motion for summary judgment by defendants Antoun, Cowley and Trulli with regard to these activities must also be denied.

Finally, I note that the allegations in Proposed Findings Nos. 46–48, 52, 68, 106, 147–149 and 179–190 relate solely to the conduct of defendant Wenrich. As discussed earlier, Wenrich is an insurance company examiner whose activities were confined to investigatory functions. As such, he is entitled only to the qualified immunity of other executive officials, and he must establish his good faith to avoid liability. Again, this is an issue best resolved at trial. The motion of defendant Wenrich for summary judgment, therefore, must be denied in all respects.

In summary, the trial of this matter will be limited to the plaintiffs' charges concerning the administrative and investigative activities of defendants Antoun, Cowley and Trulli, as well as the allegations that do not fall within any immunity category. No evidence will be heard regarding purely prosecutorial activities, as those activities have been defined above. In addition, evidence will be heard as to all the activities of defendant Wenrich.