Robert E. BROWN, Appellant,

v.

DAYTON HUDSON CORPORATION, et al, Respondents,

City of Minneapolis, et al, Respondents.

No. 81–40.

Supreme Court of Minnesota.

Dec. 17, 1981.

Roger A. Johnson, Minneapolis, for appellant.

John F. Angell, Minneapolis, for Dayton Hudson Corp., et al.

Robert J. Alfton, City Atty., and Steven R. Fredrickson, Asst. City Atty., Minneapolis, for Labat.

## OPINION

TODD, Justice.

Robert K. Brown was arrested on a charge of issuing a worthless check. His claims of mistaken identity, which he asserted immediately, subsequently proved true. The defendant, Joseph M. Labat, is an assistant Minneapolis city attorney. Labat refused to dismiss the charges or investigate facts furnished by Brown as to the mistaken identity. Upon dismissal of the charges Brown brought this action based upon malicious prosecution. The trial court granted Labat's motion for summary judgment [1] on the grounds of absolute immunity.

We affirm.

The facts relevant to this appeal are not disputed. On January 5, 1978, a person identifying himself as Robert K. Brown issued a check to Dayton's, a Minneapolis department store, in the amount of $100. The check was drawn on the Northwestern National Bank of Minneapolis, and on the instrument was printed Brown's name and address, the address listed as 2535 Clinton Avenue South, Minneapolis, Minnesota. The check was deposited for collection, but was subsequently returned to Dayton's marked "NSF". Notice of dishonor and demand for payment were sent by certified mail to Robert K. Brown at the Minneapolis address printed on the check. When Robert K. Brown failed to respond, Richard C. Olson, an employee of Dayton's, asked the Minneapolis City Attorney's office to charge Robert K. Brown with the criminal offense of issuing a worthless check. On May 12, 1978, Minneapolis police officers arrested the appellant. Brown advised the police that they had arrested the wrong person, but he was nevertheless booked and appeared in court the following day for arraignment.

At the arraignment, Brown again advised the City Attorney's office that they had arrested the wrong Robert K. Brown, that he had never had an account with the Northwestern National Bank of Minneapolis or with Dayton's Department Store, that he was from Duluth and had never resided in South Minneapolis, the address of the alleged offender, and that he had never been charged, arrested or convicted of any offense prior to that date. Brown's request that an attempt be made to verify his statements was ignored, and a pre-trial hearing was set for June 6, 1978.

Prior to the pre-trial hearing, Brown's counsel, Mr. Roger A. Johnson, drafted a letter to the City Attorney's office advising that his client did not reside in South Minneapolis and requesting that an attempt be made to verify that appellant was not the

---

1. The merits of Brown's cause of action against the remaining defendants is not before us.

party involved in the offense. No response was forthcoming.

Defendant Labat first entered this controversy when he appeared on behalf of the City Attorney's office at appellant's June 6, 1978 pre-trial hearing. Attorney Johnson advised Labat that Brown had never resided in South Minneapolis and had never had an account with the Northwestern National Bank or with Dayton's. Johnson showed Labat appellant's driver's license and social security card, and requested that Labat call or write to Dayton's or the Northwestern National Bank to verify Brown's statements. Johnson also suggested to Labat that he check the description of the person who committed the offense. Johnson also asked Labat to take a handwriting sample to verify that the signature on the bad check was not that of his client. Labat refused to take a handwriting sample and flatly refused to make any inquiry whatsoever to determine whether appellant was the proper person to be charged.

Following the pre-trial hearing, attorney Johnson wrote two letters to Labat, one dated June 8, 1978, the other July 21, 1978. In the first letter Johnson again suggested to Labat that an independent investigation of the facts would disclose that his client was not the Robert K. Brown who presented the worthless check to Dayton's. The July letter reiterated the fact that the criminal charge against Brown continued to be a source of concern and embarrassment. Labat did not respond to Johnson's correspondence, and made no attempt to verify appellant Brown's statements. Neither Brown nor his counsel attempted to contact Dayton's.

Finally, on the day of trial, and before a jury was selected, the complaining witness from Dayton's looked at appellant Brown and stated he was not the person who presented the bad check; the alleged offender was a black male, approximately 6′2″, weighing 200 pounds; appellant was white and stood but 5′10″. The charge was dismissed.

Brown alleged in his complaint that as a result of Labat's "negligent, wanton and willful conduct", his reputation has been damaged, he has incurred the expense of maintaining a legal defense, and he has lost time from his employment by having to appear in the criminal proceedings. Brown did not request compensatory damages; instead, he asked that punitive damages be assessed against defendant Labat in the amount of $500,000. On November 10, 1980, the trial court granted Labat's motion for summary judgment finding that because Labat's alleged acts constituted an "integral part of the judicial process", he was shielded from civil liability by the cloak of prosecutorial immunity.

The issue presented is whether a prosecutor acting in his official capacity is entitled to an absolute immunity or should only be granted a qualified immunity.

This appeal presents to the court the opportunity to delineate the scope of prosecutorial immunity in this state and is a case of first impression. Appellant Brown argues that while a prosecutor should be protected by a degree of immunity from civil liability, immunity should not be extended to defendant Labat because of the "extraordinary circumstances" of this case. To deny the plaintiff his day in court, argues Brown, would contribute to the "erosion of the public trust and confidence in the Office of the Prosecuting Attorney." Respondent Labat argues that anything less than absolute immunity for a prosecutor acting in his official capacity would pose a legitimate threat to the effective administration of the criminal justice system.

The most often cited case discussing the policy considerations which underlie the common law grant of immunity to public prosecutors, and the case upon which the trial court relied, is *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). While the question which confronted the Supreme Court in *Imbler* concerned the scope of prosecutorial immunity in a civil rights action brought under 42 U.S.C. § 1983, the court found that the same public policy considerations which underlie the common law rule of immunity dictated a similar rule for actions brought against state prosecutors under the federal statute.

In *Imbler*, the plaintiff alleged that defendant Pachtman, a California District Attorney, had "with intent, and on other occasions with negligence" allowed a witness to give false and misleading testimony, and that Pachtman had prosecuted the plaintiff with knowledge that a lie detector test had allegedly "cleared" the plaintiff of wrongdoing. The federal district court granted Pachtman's rule 12(b)(6) motion to have the complaint dismissed as to him, and the Ninth Circuit affirmed in an opinion finding Pachtman's alleged acts to have been committed "during prosecutorial activities which can only be characterized as an 'integral part of the judicial process.'" 500 F.2d at 1302 (quoting *Marlowe v. Coakley*, 404 F.2d 70 (9th Cir. 1968)). The Supreme Court granted certiorari, and in an opinion authored by Justice Powell, affirmed the court of appeals.

The high court ruled that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." 424 U.S. at 431, 96 S.Ct. at 995. Recognizing that a "qualified" or "good faith" immunity would in many cases require a factual inquiry into the motives and intentions of a prosecutor by discovery and at trial, and concerned with the fact that a qualified immunity would pose a danger of liability even to the honest prosecutor, Justice Powell reasoned that absolute prosecutorial immunity was necessary to preclude the possibility "that harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and * * * that he would shade his decisions instead of exercising the independence of judgment required by his public trust." 424 U.S. at 423, 96 S.Ct. at 991. The court acknowledged that it was called upon to choose between the lesser of two evils:

> To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest. It would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system.

424 U.S. at 427, 96 S.Ct. at 993.

The holding in *Imbler* is reflected in the RESTATEMENT (SECOND) OF TORTS § 656 (1970), which provides that "[a] public prosecutor acting in his official capacity is absolutely privileged to initiate, institute, or continue criminal proceedings." Comment b to § 656 describes the absolute nature of the immunity:

> The privilege stated in this section is absolute. It protects the public prosecutor against inquiry into his motives, and from liability, even though he knows that he has no probable cause for the institution of the proceedings and initiates them for an altogether improper purpose.

The overwhelming majority of state courts have extended to prosecuting attorneys an immunity similar to that formulated by the United States Supreme Court in *Imbler*, holding that when a prosecutor acts within the scope of his duties by filing and maintaining criminal charges, he is absolutely immune from civil liability, notwithstanding allegations of negligence, improper motive or lack of probable cause. *See, e.g., McDonald v. Lakewood Country Club*, 170 Colo. 355, 461 P.2d 437 (1969); *Coleson v. Spomer*, 31 Ill.App.3d 563, 334 N.E.2d 344 (1975); *Moser v. County of Black Hawk*, 300 N.W.2d 150 (Iowa 1981); *Burr v. City of Cedar Rapids*, 286 N.W.2d 393 (Iowa 1979); *Knight v. Neodesha, Kansas, Police Department*, 5 Kan.App.2d 472, 620 P.2d 837 (1980); *State ex rel. Department of Justice v. District Court*, 172 Mont. 88, 560 P.2d 1328 (1976); *Whitmore v. City of New York*, 80 App.Div.2d 638, 436 N.Y.S.2d 323 (1981); *Powell v. Seay*, 553 P.2d 161 (Okla. 1976); *Kuchenreuther v. Whatcom County*, 24 Wash.App. 716, 604 P.2d 499 (1979); *Polidor v. Mahady*, 130 Vt. 173, 287 A.2d 841 (1972). Because public prosecutors must exercise a discretionary judgment on the basis of evidence presented to them, many of these courts refer to prosecutors as "quasi-judicial" officials, and hence characterize their immunity as "quasi-judicial" in nature.

. The concept of quasi-judicial immunity is not new to Minnesota. Judicial officers are absolutely immune from civil liability for acts done while acting in their judicial capacity, regardless of motive. *Linder v. Foster*, 209 Minn. 43, 295 N.W. 299 (1940). In *Robinette v. Price*, 214 Minn. 521, 8 N.W.2d 800 (1943), this court held that "[a] public officer whose functions are judicial or quasi-judicial is not liable to persons injured by the honest exercise of his judgment within his jurisdiction, however erroneous his judgment may be." *Id.* at 533, 8 N.W.2d at 807. The court found in *Robinette* that because the duties of members of a county welfare board involved the exercise of judgment based on a factual inquiry, the duties were "quasi-judicial" in nature. In *Hoppe v. Klapperich*, 224 Minn. 224, 28 N.W.2d 780 (1947), the court held that an attorney, as an officer of the court, "enjoys immunity from liability to a third person insofar as he does not materially depart from his character as a *quasi-judicial officer* charged with responsibility for the administration of justice." *Id.* at 241, 28 N.W.2d at 791 (emphasis added). More recently, the court held in *DePalma v. Rosen*, 294 Minn. 11, 199 N.W.2d 517 (1972), that members of the St. Paul City Council were immune from civil liability for acts properly characterized as quasi-judicial and discretionary. *See also Stewart v. Case*, 53 Minn. 62, 54 N.W. 938 (1893) (immunity of tax assessor acting in quasi-judicial capacity).

We hold that Labat was acting in a quasi-judicial capacity. The discretionary decision whether to charge and whether to continue a prosecution lies at the very heart of the prosecutorial function. We adopt the majority rule that public prosecutors, when acting within the scope of their duties by filing and maintaining criminal charges, are absolutely immune from civil liability. While a qualified immunity might be sufficient to protect the honest prosecutor from an unjust damage award, it would not be sufficient to protect him from harassing litigation. As Justice White stated in his concurring opinion in *Imbler v. Pachtman*,

> I agree with the majority that it is not sufficient merely to set the standard of proof in a malicious prosecution case very high. If this were done, it might be possible to eliminate the danger of an unjust damage award against a prosecutor. However, the risk of having to *defend* a suit—even if certain of ultimate vindication—would remain a substantial deterrent to fearless prosecution.

424 U.S. at 438 n.4, 96 S.Ct. at 998 n.4, (emphasis in original).

Affirmed.

OTIS, Justice (concurring specially).

By way of footnote, it seems appropriate to point out that we do not hold that "absolute" immunity protects a prosecutor who maliciously and intentionally brings criminal charges against an innocent person, knowing the accused to be innocent.

Under such circumstances the prosecutor would not be acting in the quasi-judicial capacity to which the rule in this case applies.