Alexander DICK and Irene
Dick, Plaintiffs,

v.

WATONWAN COUNTY, Watonwan County Welfare Department and Mr. Bill Schutt, its Supervisor of Human Services, Ms. Deborah Hunter, Mental Health Worker, Mr. Jerry Ruppert, title unknown, and John Doe and Mary Roe, whose true names and titles are unknown, Watonwan County Sheriff, V.H. Engdahl, and Public School District # 840 and Ms. Maureen McCarthy, Guidance Counselor, and Mr. Daniel Birkholz, Watonwan County Attorney, Defendants.

Civ. No. 4–82–116.

United States District Court,
D. Minnesota,
Fourth Division.

Dec. 1, 1982.

Jerome S. Rice, Gregory T. Spalj, Minneapolis, Minn., for plaintiffs.

Jack M. Fribley, G. Allan Cunningham, Faegre & Benson, Minneapolis, and Douglas J. Muirhead, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, Minn., for defendants Watonwan County, Sheriff Engdahl, and Daniel Birkholz.

James B. Wallace, C. Allen Dosland, Gislason, Dosland, Hunter & Malecki, New Ulm, Minn., for defendants Watonwan County Welfare Dept., Bill Schutt, Deborah Hunter, and Jerry Ruppert.

Gerald L. Maschka, Farrish, Johnson, Maschka & Hottinger, Mankato, Minn., for defendants Independent School Dist. # 840 and Maureen McCarthy.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on the defendants' separate motions for summary judgment. The plaintiffs' amended complaint alleges a cause of action under 42 U.S.C. § 1983 based on the plaintiffs' involuntary commitment to detoxification centers in December of 1980. The plaintiffs also allege causes of action for false arrest and false imprisonment and for conspiracy to deprive the plaintiffs of their constitutional rights. The defendants claim immunity from suit as well as other defenses.

### FACTS

On December 5, 1980, the plaintiffs, Alexander and Irene Dick, husband and wife, were arrested at their home in St. James, Minnesota, by defendant Watonwan County Sheriff V.H. Engdahl and several of his deputies. The sheriff was executing two orders for apprehension and confinement issued without a hearing by Watonwan County Court Judge David R. Teigum. The orders were based on petitions for judicial commitment which alleged that the Dicks were "inebriates." The petitions were drafted by defendant Watonwan County Attorney Daniel Birkholz[1] and signed by defendant Deborah Hunter, then an employee of the defendant Watonwan County Welfare Department.[2] The petitions were based almost exclusively on information supplied by the Dicks' 15-year-old daughter Valerie. It is undisputed that the Dicks were not intoxicated when they were arrested.

---

1. Defendant Birkholz originally was not a defendant to this lawsuit. The plaintiffs' motion to amend their complaint to add Birkholz as a defendant was denied by the United States Magistrate on October 18, 1982, as untimely. On October 29, 1982, the Court overruled the Magistrate's order and granted the plaintiffs' motion to amend.

2. The correct name of this agency is the subject of some dispute. The agency has been variously referred to in the briefs as the Watonwan County Welfare Department, Watonwan County Human Services Department, and Tri-County Human Services Department. The Court will refer to the agency as the Watonwan County Welfare Department, the name used in the Welfare Department's own brief.

The Dicks were transported in marked police cars to separate detoxification centers. There they were stripped of their personal possessions, including Irene Dick's blood-pressure medicine. While confined at the center, Irene Dick was required to attend movies on alcohol abuse. She was also visited by defendant Jerry Ruppert, then a chemical dependency counselor employed by the Watonwan County Welfare Department, who allegedly tried to pressure her into voluntarily committing herself for alcohol treatment.

The Dicks were confined at the detoxification centers from the evening of Friday, December 5, 1980, until Monday, December 8, 1980, when a probable cause hearing was held before Judge Teigum. At the conclusion of that hearing, the Dicks were released and the proceedings were continued for six months pursuant to a stipulation requiring the Dicks to attend alcohol counseling sessions. The Dicks attended two or three sessions. On June 12, 1981, the county dismissed both cases against the Dicks.

The Dicks' arrest and commitment arose out of conversations the Dicks' daughter, Valerie, had at school with defendant Maureen McCarthy, a guidance counselor employed at the time by defendant Public School District # 840. Valerie, who was 15 at the time of the Dicks' commitment, is the youngest of six children in the Dick family. The Dicks emigrated from Scotland in 1978. Their 35-year-old daughter, Irene Young, is married and also lives in St. James. Their four sons live in Scotland. Valerie's conversations with McCarthy were part of a program of group discussions at St. James High School which centered on students' problems at home and at school.

On December 4, 1980, while talking privately with McCarthy, Valerie raised the subject of foster care. Valerie expressed a desire to get out of her home for a while because of her parents' frequent arguments—arguments which usually concerned Valerie's staying out late at night. McCarthy and Valerie also discussed Valerie's parents' drinking. Deposition of Valerie Dick, May 10, 1982, at 31–35.

Later that day, McCarthy telephoned defendant Deborah Hunter, a mental health worker for the Watonwan County Welfare Department, to discuss whether Valerie would be eligible for foster care. Hunter told McCarthy there did not appear to be sufficient grounds to remove Valerie from her home, but that she would check into the matter. Deposition of Maureen McCarthy, Aug. 5, 1982, at 69.

On the morning of Friday, December 5, 1980, Hunter called McCarthy to say that Hunter had discovered additional information which might provide sufficient grounds to seek a dependency petition so that Valerie could be placed in foster care. *Id.* at 72. The additional information was a record showing that the local police had been called to the Dick household on October 31, 1980, to settle a domestic dispute.

Later that morning, Hunter, McCarthy, and defendant Jerry Ruppert, a chemical dependency counselor also employed at the time by the Watonwan County Welfare Department, met with Valerie in McCarthy's office at the school. Valerie told the three defendants about her parents' drinking and about the arguments at home. Deposition of Valerie Dick, May 10, 1982, at 36.

After the conversation at the school, McCarthy, Hunter, and Ruppert took Valerie over to the office of County Attorney Birkholz. Hunter and Ruppert first met with Birkholz alone and relayed the information Valerie had given them. The plaintiffs allege that Hunter and Ruppert distorted and exaggerated Valerie's statements while talking to Birkholz. Later, Valerie was brought in and Birkholz interviewed her personally. McCarthy, the school guidance counselor, was not present during either meeting.

There is a considerable dispute over what Valerie told Birkholz, Hunter, and Ruppert about her home life and her parents' drinking. Birkholz' version is that Valerie stated that her parents drank five nights a week, usually to excess, that her mother would sometimes throw up blood after drinking, that after drinking excessively her parents would often become verbally abusive to-

wards one another, and that her mother frequently woke her up in the middle of the night after drinking to talk, but was often unable to remember the conversations in the morning. Deposition of Daniel Birkholz, Apr. 8, 1982, at 51–57. Further, Birkholz testified that Valerie told him that she had on one occasion seen her father shake her mother during an argument, that she wanted to get out of the house that day because her parents were attending her father's company Christmas party that evening and she did not want to be home when they returned in case they came home intoxicated, and that her father sometimes drove after drinking. *Id.*

Valerie's version of her statements to Birkholz, Hunter, and Ruppert is much different. In her deposition, Valerie denies saying that her parents drank to excess, that she was afraid for her safety, and that she did not want to return home. Deposition of Valerie Dick, May 10, 1982, at 46–47. She also denies saying that her parents were physically abusive toward one another, and that her father drove while intoxicated. *Id.* at 56, 63.

At the conclusion of these meetings, Birkholz had petitions for commitment prepared for Alexander and Irene Dick.[3] The petitions incorporated Birkholz' version of the above facts.[4] Birkholz testified that the decision to seek involuntary commitment of the Dicks was "a joint decision by Deborah Hunter, Jerry Ruppert and myself . . . ." Deposition of Daniel Birkholz, Apr. 8, 1982, at 58.

Valerie refused to sign either commitment petition because she "did not want to go through with what was going on there." Deposition of Valerie Dick, May 10, 1982, at 65. Valerie also testified that, although she skimmed the petitions and believed that many of the statements contained in them were untrue, she did not tell Birkholz that any of the statements were untrue because she was too upset. *Id.* at 54, 60. Deborah Hunter signed the petitions after Valerie's refusal to do so.

None of the defendants attempted to verify any of Valerie's statements concerning her parents' drinking. Birkholz' explanation for not contacting Irene Young, Valerie's 35-year-old sister who also lived in St. James, was that since Valerie had told him

---

**3.** It is unclear exactly when the decision was made to seek commitment of the Dicks rather than just foster care for Valerie. A petition for dependency was also prepared for Valerie, but apparently was not presented to the judge. Valerie spent the first night of her parents' commitment at her minister's house and the remaining nights at a friend's house. Thereafter, she spent two weeks at her sister's house in St. James before returning to her parents' home. Valerie is now married and lives with her husband in the Dicks' home.

**4.** The petition for judicial commitment of Alexander Dick states:

7. Patient is believed to be inebriate because[:] Petitioner has been informed of the following facts by Valerie Dick and believes them to be true. That as long as Valerie Dick can remember, her father has been consuming alcohol to excess. That patient drinks to the point of intoxication and passes out on the average of 5 out of 7 nights per week. That patient after he has been drinking, he becomes very vulgar, profane and abusive with other family members. That patient also becomes violent and has, on occasion, becomes [sic] physically abusive towards his wife. That patient is dangerous to

other [sic] on account of his violent behavior and he also drives a car when he is intoxicated.

The petition for judicial commitment of Irene Dick states:

7. Patient is believed to be inebriate because[:] Petitioner has been informed of the following facts by Valerie Dick and believes them to be true. That as long as Valerie Dick can remember, her mother has been consuming alcohol to excess. That patient drinks to the point of intoxication. That when patient has been drinking alcohol she commonly becomes physically ill and throws up, and at times expells [sic] blood. That patient becomes violent when she has been drinking to excess, and within the last several weeks patient, with a knife in her hand, threatened to stab her husband and the police were called to settle the dispute of the two drinking parents. That the patient is physically unable to care for herself when she becomes ill and is endangering her physical well-being with the protracted, excessive use of alcohol. That the patient is also on medication and should not be using alcohol to excess.

that Irene and her husband were drinking companions of the Dicks, "we didn't feel we could get an objective opinion from the Youngs ...." Deposition of Daniel Birkholz, Apr. 8, 1982, at 39. Birkholz also did not check Alexander Dick's driving record to see if he had any arrests or convictions for drunk driving, *id.* at 74–75, even though the concern that Alexander Dick might drive while intoxicated was one of the main reasons Birkholz, Hunter, and Ruppert decided to seek the Dicks' immediate commitment, *id.* at 69–70.

Finally, it is undisputed that the Dicks were not intoxicated on the afternoon of their arrest. There was no indication they had been drinking, *see* Deposition of Sheriff V.H. Engdahl, Apr. 8, 1982, at 21; nor were there any signs of violence at the Dick household, *see id.* at 26–27. The Dicks complied with the commitment orders peacefully. *Id.* at 18.

## DISCUSSION

### A. *Minnesota Judicial Commitment Law*

At the time of the Dicks' commitment, Minnesota law authorized the temporary commitment of "inebriate persons" without a hearing. Minn.Stat. § 253A.07, *repealed* by Minnesota Commitment Act of 1982, 1982 Minn.Laws ch. 581 (codified at Minn. Stat. §§ 253B.01–253B.23). The law was repealed in 1982.[5] Minn.Stat. § 253A.02, subd. 4 defined "inebriate person" as follows:

"Inebriate person" means any person determined as being incapable of managing himself or his affairs by reason of the habitual and excessive use of intoxicating liquors, narcotics, or other drugs. For the purpose of involuntary commitment of a person as inebriate it is necessary for the court to find: (a) that the person is an inebriate person, and (b) that involuntary hospitalization is necessary for the welfare of the person or the protection of society ....

Minn.Stat. § 253A.07 set out the procedure to be followed for the involuntary commitment of an inebriate person.[6]

Subdivision 1. Any interested person may file in the probate court of the county of the proposed patient's settlement or presence a petition for commitment of a proposed patient, setting forth the name and address of the proposed patient, the

---

**5.** In 1982, the Minnesota Legislature repealed the entire chapter of statutes relating to the hospitalization and commitment of mentally ill, mentally deficient, and inebriate persons; *i.e.,* Minn.Stat. §§ 253A.01–253A.23. In its place, the Legislature enacted the Minnesota Commitment Act of 1982, 1982 Minn.Laws ch. 581 (codified at Minn.Stat. §§ 253B.01–253B.23). The new law is similar to the old law in that it provides for the temporary, prehearing commitment of mentally ill, mentally retarded, or chemically dependent persons. Minn.Stat. § 253B.07, subd. 6. However, the standard of dangerousness which must be met before a person can be committed on a prehearing basis is much higher under the new law. *See* note 15 *infra.* The defendants' conduct must, of course, be judged in accordance with the law as it existed at the time of the Dicks' commitment.

**6.** The plaintiffs contend that both County Attorney Birkholz and Sheriff Engdahl believed they were acting under a different statute, Minn.Stat. § 253A.04, subd. 2, in arresting and confining the plaintiffs. Neither the commitment orders nor the underlying petitions indicate the statutory authority for the Dicks' commitment. Section 253A.04, subd. 2 provided:

A peace or health officer or a person working under such officer's supervision, may take a person who is intoxicated in public into custody and transport him to a licensed hospital, mental health center facility or a person on the staff of a state licensed or approved program equipped to treat drug dependent persons. Provided, if such person is not endangering himself or any other person or property the peace or health officer may transport the person to his home.

The plaintiffs argue that since they were not intoxicated when arrested (nor were they in public), their arrest and confinement was invalid under section 253A.04, subd. 2. They further argue that Birkholz and Engdahl should not now be allowed to rely on section 253A.07 to justify the arrest and confinement.

Without deciding whether the Dicks' arrest and confinement was lawful under section 253A.04, subd. 2, the Court rejects the argument that Birkholz and Engdahl are estopped from relying on section 253A.07. Any mistake those officials may have made as to the source of their authority has no bearing on the lawfulness of their conduct.

name and address of his nearest relatives, and the reasons for the petition. Such petition shall be accompanied either by a written statement by a licensed physician stating that he has examined the proposed patient and is of the opinion that the proposed patient may be mentally ill, mentally deficient, or inebriate, and should be hospitalized, or by a written statement by the petitioner that, after reasonable effort, the petitioner has been unable to obtain an examination by a licensed physician or that an examination could not be performed. Before filing, a copy of the petition shall be delivered by the petitioner to the designated agency.

. . . .

Subd. 3. The court may direct a health or peace officer or any other person to take the proposed patient into custody and transport him to a public hospital, private hospital consenting to receive him, public health facility, or other institution, for observation, evaluation, diagnosis, emergency treatment, care, and if necessary, confinement. The order of the court may be executed on any day and at any time thereof, by the use of all necessary means including the breaking open of any place in which the proposed patient is located and the imposition of necessary restraint upon the person of such proposed patient. Unless otherwise ordered by the court, a peace officer taking the proposed patient into custody pursuant to this subdivision shall not be in uniform and shall not use a motor vehicle visibly marked as a police vehicle.

Prior to its repeal, section 253A.07 was upheld against constitutional attack by the Minnesota Supreme Court. In *State ex rel. Doe v. Madonna*, 295 N.W.2d 356 (Minn. 1980), the plaintiff, suing on behalf of alleged mentally ill persons confined pursuant to section 253A.07, challenged the statute on due process grounds.[7] The court found that the statute had been unconstitutionally applied to the named plaintiffs because they had not received a hearing within 72 hours of the commencement of their commitment. But the court upheld the facial constitutionality of the statute by implying two requirements. First, the court required that the probate court make a finding of "probable dangerousness" before ordering an individual committed.[8] Second, the court required that an individual committed under section 253A.07 be given a hearing within 72 hours rather than five days as provided in the statute. *Madonna*, 295 N.W.2d at 365.

The Dicks argue that section 253A.07 was unconstitutionally applied to them because none of the defendants made any attempt to corroborate the information given by Valerie. The Dicks point to a footnote in the *Madonna* opinion which notes that the Hennepin County Welfare Department (the agency involved in *Madonna*) uses a "complex, careful screening procedure . . . which corroborates the information on petitions where possible and explores all reasonable alternatives to commitment." *Madonna*, 295 N.W.2d at 362 n. 8. The Dicks allege that the defendants were grossly negligent in failing to investigate and corroborate Valerie's information before seeking their commitment. Their cause of action is based on 42 U.S.C. § 1983 and on Minnesota's common law prohibition against false arrest and false imprisonment. The Dicks also allege a conspiracy amongst Birkholz, Hunter, Ruppert, Bill Schutt, supervisor of the Watonwan County Welfare Department, and McCarthy, the school guidance counselor, to commit them as part of a publicized campaign against alcohol and drug abuse in St. James.[9] They seek $1 million in com-

7. Although the challenge in *Madonna* was to the statute's provisions authorizing commitment of mentally ill persons, the court discussed the provisions relating to inebriate persons as well. *See, e.g.,* 295 N.W.2d at 363.

8. The plaintiffs point out that neither of Judge Teigum's commitment orders includes a finding of probable dangerousness. However, under *Madonna*, such a finding need not be explicit, but can be inferred from the action taken; *i.e.,* commitment. *See Madonna,* 295 N.W.2d at 364.

9. The plaintiffs' amended complaint does not state the statutory basis for this conspiracy claim. It is clear that the complaint does not state a cause of action under 42 U.S.C.

pensatory damages, $1 million in punitive damages, and their attorneys' fees.

The defendants' motions for summary judgment are each based primarily on a claim of immunity. These motions will be considered separately.

### B. *Immunities*

Two types of immunities may apply to a defendant in a section 1983 case. The defendant may have absolute immunity, or the defendant may have qualified immunity, often referred to as good faith immunity. The difference between the two types of immunity is important in the context of a summary judgment motion. While an absolute immunity "defeats a suit at the outset so long as the official's actions were within the scope of the immunity," *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976), a defendant clothed with qualified immunity can succeed on a motion for summary judgment only by demonstrating the "objective reasonableness of [his or her] conduct, as measured by reference to clearly established law . . . ." *Harlow v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982) (footnote omitted). In the latter case, the burden is on the defendant to show that he or she did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at ——, 102 S.Ct. at 2738; *Green v. White,* 693 F.2d 45, at 47 (8th Cir.1982). This objective test allows a court to grant the defendant's motion for summary judgment where the plaintiff can muster no more than "bare allegations of malice" on the part of the defendant. *Harlow,* —— U.S. at ——, 102 S.Ct. at 2738.

The classes of persons who enjoy absolute immunity from section 1983 liability for acts done in the scope of their official duties are quite limited. The list includes legislators, *Tenney v. Brandhove,* 341 U.S. 367, 377, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951); judges, *Pierson v. Ray,* 386 U.S. 547, 553–54, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967); and prosecutors, *Imbler v. Pachtman,* 424 U.S. 409, 427, 96 S.Ct. 984, 993, 47 L.Ed.2d 128 (1976). Of the defendants involved in this case, only County Attorney Birkholz is a member of any of these classes. The defendants other than Birkholz possess, at most, qualified immunity.

### 1. *Sheriff Engdahl*

Sheriff Engdahl contends that he is immune from liability under section 1983 because he was merely carrying out the facially valid commitment orders signed by Judge Teigum. The plaintiffs respond that the existence of a court order does not necessarily protect Sheriff Engdahl from liability.

▪ It is true that a sheriff who follows the dictates of a court order is not necessarily immune. *Sebastian v. United States,* 531 F.2d 900, 903 n. 6 (8th Cir.) ("We do not hold that the unquestioning execution of a judicial directive may never provide a basis for liability against a state officer."), *cert. denied,* 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1976). But it is well established that a sheriff who acts in good faith reliance on a facially valid court order is immune from a section 1983 lawsuit. *Tymiak v. Omodt,* 676 F.2d 306, 308 (8th Cir. 1982) (per curiam); *Turner v. Raynes,* 611 F.2d 92, 93 (5th Cir.); *cert. denied,* 449 U.S. 900, 101 S.Ct. 269, 66 L.Ed.2d 129 (1980); *Sebastian v. United States,* 531 F.2d 900, 903 (8th Cir.), *cert. denied,* 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1976).[10]

§ 1985(3) because the plaintiffs have not alleged that the defendants acted out of any "class-based animus." *Silkwood v. Kerr-McGee Corp.,* 637 F.2d 743, 747–48 (10th Cir. 1980), *cert. denied,* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981); *Sebastian v. United States,* 531 F.2d 900, 904 n. 11 (8th Cir.), *cert. denied,* 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1976). A conspiracy claim may properly be brought under 42 U.S.C. § 1983 without

alleging class-based animus. *See Sebastian,* 531 F.2d at 904 n. 11. In view of the policy of liberally construing pleadings in civil rights suits, the Court will assume that the plaintiffs' conspiracy claim is brought under section 1983.

**10.** The plaintiffs' reliance on *Farmer v. Lawson,* 510 F.Supp. 91 (N.D.Ga.1981) is misplaced. In *Farmer,* the court denied summary judgment to two sheriffs who executed a

In this case, the commitment orders were valid on their face. Although the orders did not contain an explicit finding of "probable dangerousness," the Minnesota Supreme Court has held that defect does not invalidate a commitment order. *State ex rel. Doe v. Madonna*, 295 N.W.2d 356, 365 (Minn.1980); *see* note 8 *supra*.

Further, the evidence does not support a finding that Sheriff Engdahl lacked good faith in executing the commitment orders. The plaintiffs are entitled to the benefit of all favorable inferences that can be drawn from the evidence. *Vette Co. v. Aetna Cas. & Sur. Co.*, 612 F.2d 1076, 1077 (8th Cir. 1980). The evidence before the Court consists of the parties' depositions, as well as various affidavits and nonparty depositions. In his deposition, Sheriff Engdahl testified that he had no indication at the time he executed the commitment orders that the orders were not valid. Deposition of V.H. Engdahl, Apr. 8, 1982, at 81. He further testified that in arresting the Dicks he believed he was carrying out his duty, *id.,* and felt that his actions were in accordance with Minnesota law, *id.* at 38–39. Sheriff Engdahl was familiar with the procedure for involuntary, prehearing commitment, as he had arrested persons pursuant to commitment orders on numerous occasions in the past. *Id.* at 25. Nothing in Sheriff Engdahl's deposition even remotely suggests that he acted in bad faith in arresting the Dicks.

The Dicks rely on the deposition testimony of their elder daughter, Irene Young, and her husband Homer Young, both of whom were present when the Dicks were arrested, as evidence of Sheriff Engdahl's bad faith. These witnesses testified that while executing the commitment orders, Sheriff Engdahl and some of his deputies made comments to the effect that the arrest and confinement were wrong, but that Sheriff Engdahl had to execute the orders. Deposition of Irene Young, Aug. 26, 1982, at 38–40; Deposition of Homer Young, Aug. 26, 1982, at 22. Sheriff Engdahl denies making any such comments. Deposition of V.H. Engdahl, Apr. 8, 1982, at 21–22. The Dicks argue that these alleged comments by Sheriff Engdahl show that he knew the court orders were wrongfully obtained, and that he therefore acted in bad faith in executing them.

The evidence does not support such a conclusion. At most, Sheriff Engdahl's comments, if indeed they were made, suggest only that Sheriff Engdahl disagreed with the law on which the Dicks' arrest was based, not that he believed the orders were wrongfully obtained. Sheriff Engdahl could not have known whether the orders were wrongfully obtained because he did not participate in their procurement.[11] Any personal disagreement Sheriff Engdahl may have had with the judicial commitment law of course did not excuse him from carrying out his duty to follow that law.

Sheriff Engdahl's deposition indicates that he acted in good faith in executing the commitment orders. The plaintiffs' evidence suggests nothing to the contrary. In the absence of any indication of bad faith, Sheriff Engdahl's performance of his duty

---

search warrant which later proved to be invalid. *Farmer* is distinguishable because the sheriffs in that case procured the search warrant. The court found that a question for the fact finder existed whether the sheriffs "acted in good faith in securing the search warrant." 510 F.Supp. at 96. In this case, it is undisputed that Sheriff Engdahl did not participate in obtaining the commitment orders. His only involvement with the Dicks occurred after the orders had been issued.

11. Apparently conceding this point, plaintiffs' counsel contended during oral argument that Sheriff Engdahl nevertheless was in collaboration with the other defendants who did partici-

pate in the procurement of the orders because Sheriff Engdahl allegedly had instructions not to let the Dicks or their relatives talk to Valerie until after the Dicks were in custody. This argument is unpersuasive. First, the evidence shows that despite these alleged instructions, Sheriff Engdahl allowed Irene Young to attempt to telephone Valerie before the Dicks were taken into custody. Deposition of Irene Young, Aug. 26, 1982, at 33. Second, if Sheriff Engdahl was part of some concerted action to deprive the Dicks of their constitutional rights, he certainly would not have advertised that fact by telling the Youngs that the Dicks' arrest was wrong.

cannot be a basis for section 1983 liability. *Pierson v. Ray,* 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); *Landrum v. Moats,* 576 F.2d 1320, 1327 (8th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978).

■ Similarly, Sheriff Engdahl can incur no liability based on the plaintiffs' common law claim for false arrest and false imprisonment. The sheriff's good faith in carrying out the commitment orders is again the determinative factor. *Rosvall v. Provost,* 279 Minn. 119, 123, 155 N.W.2d 900, 904 (1968). Since there is no evidence Sheriff Engdahl acted in bad faith in executing the orders, the plaintiffs have no cause of action against him for false arrest or false imprisonment. *Rosvall,* 279 Minn. 119, 123, 155 N.W.2d 900, 904; *see also Morgan v. McLaughlin,* 290 Minn. 389, 391, 188 N.W.2d 829, 831 (1971). Accordingly, the plaintiffs' complaint against Sheriff Engdahl is dismissed.

### 2. *County Attorney Birkholz*

■ State prosecutors are absolutely immune from section 1983 liability for initiating a prosecution and presenting the state's case. *Imbler v. Pachtman,* 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976); *White v. Bloom,* 621 F.2d 276, 280 (8th Cir.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 533, 66 L.Ed.2d 292 (1980). But absolute immunity extends only to the prosecutor's prosecutorial (or quasi-judicial) function, as opposed to his or her investigative or administrative function. *Briggs v. Goodwin,* 569 F.2d 10, 16 (D.C.Cir.1977), *rev'd on other grounds sub nom. Stafford v. Briggs,* 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980); Note, *Supplementing the Functional Test of Prosecutorial Immunity,* 34 Stan.L.Rev. 490–91 (1982).

■ Thus, the first question is whether Birkholz' participation in the civil commitment procedures was an exercise of his prosecutorial function. In *Sebastian v. United States,* 531 F.2d 900, 903 (8th Cir.), *cert. denied,* 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1976), the United States Court of Appeals for the Eighth Circuit held implicitly that such participation is protected prosecutorial activity by affirming the granting of summary judgment to a prosecutor who prepared a civil commitment petition. The court's decision in *Martin v. Aubuchon,* 623 F.2d 1282 (8th Cir.1980) (per curiam), is also instructive. *Martin* held that a prosecutor who initiated a dependency proceeding to remove a child from its parent was immune from suit. 623 F.2d at 1285. Therefore, Birkholz' initiation of civil commitment proceedings against the Dicks is a prosecutorial function protected by absolute immunity.

The plaintiffs nevertheless contend that Birkholz should be stripped of his immunity because of his alleged prosecutorial misconduct. The plaintiffs allege that Birkholz (1) failed to make an adequate investigation before preparing petitions for their commitment, and (2) fabricated accusations against them, or at least embellished Valerie's accusations, in preparing the commitment petitions.

■ Assuming, *arguendo,* the truth of the plaintiffs' allegations, Birkholz' conduct does not justify stripping him of his immunity. Courts uniformly have held that a prosecutor is immune from liability for failure to adequately investigate the accusations against a defendant before charging him or her. *Henzel v. Gerstein,* 608 F.2d 654, 657 (5th Cir.1979); *Halpern v. City of New Haven,* 489 F.Supp. 841, 843 (D.Conn. 1980); *Hall v. Flathead County Attorney,* 478 F.Supp. 644, 645 (D.Mont.1979).[12]

---

**12.** Although the cited cases involved criminal prosecutions as opposed to the civil proceedings at issue here, the Eighth Circuit has not distinguished between criminal and civil cases in defining the scope of prosecutorial immunity. *See Sebastian v. United States,* 531 F.2d 900, 903 (8th Cir.), *cert. denied,* 429 U.S. 856, 97 S.Ct. 153, 50 L.Ed.2d 133 (1976). Moreover, the United States Supreme Court has indicated that the nature of the proceeding does not affect the scope of prosecutorial immunity. *See Butz v. Economou,* 438 U.S. 478, 516–17, 98 S.Ct. 2894, 2915–16, 57 L.Ed.2d 895 (1978); *see also Safeguard Mut. Ins. Co. v. Miller,* 456 F.Supp. 682, 688 (E.D.Pa.1978) (question of

Birkholz' alleged falsification of evidence against the Dicks also does not destroy his absolute immunity since Birkholz was acting in his prosecutorial capacity. *Lee v. Willins,* 617 F.2d 320, 322 (2d Cir.), *cert. denied,* 449 U.S. 861, 101 S.Ct. 165, 66 L.Ed.2d 78 (1980); *see also Hilliard v. Williams,* 540 F.2d 220, 221–22 (6th Cir.1976) (per curiam). Only in cases involving egregious prosecutorial misconduct, such as the commission of perjury, *see Briggs v. Goodwin,* 569 F.2d 10 (D.C.Cir.1977), *rev'd on other grounds sub nom. Stafford v. Briggs,* 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980), or the destruction of exculpatory evidence, *see Wilkinson v. Ellis,* 484 F.Supp. 1072 (E.D.Pa.1980), will a prosecutor lose the protection of absolute immunity. Birkholz' alleged misconduct did not rise to that level. The plaintiffs do not allege that Birkholz embellished or falsified *all* the accusations contained in the commitment petitions. Further, Birkholz' inclusion of some false statements in the petitions technically would not make him guilty of perjury since Deborah Hunter, not Birkholz, signed the petitions under oath. No basis exists for stripping Birkholz of his absolute immunity.

 The plaintiffs' other claims against Birkholz require little discussion. Birkholz' absolute immunity from section 1983 liability shields him from the plaintiffs' conspiracy claim. *See* note 9 *supra.* The Minnesota Supreme Court recently adopted the rule that prosecutors are absolutely immune under Minnesota law from civil liability for injuries inflicted while acting within the scope of their prosecutorial duties. *Brown v. Dayton Hudson Corp.,* 314 N.W.2d 210, 214 (Minn.1981). Consequently, the plaintiffs may not maintain an action against

Birkholz for common law false arrest and false imprisonment.

3. *Watonwan County Welfare Department, Bill Schutt, Deborah Hunter, and Jerry Ruppert*

Bill Schutt, Deborah Hunter, and Jerry Ruppert were each employed by the Watonwan County Welfare Department at the time of the Dicks' arrest and confinement. Bill Schutt was the supervisor of the department and was also its chemical dependency coordinator. Schutt did not participate directly in the meetings with Valerie Dick and with County Attorney Birkholz which led to the procurement of the commitment orders. Deborah Hunter was a first-year mental health worker with the department. Hunter signed the petitions for commitment after Valerie refused to do so. Jerry Ruppert was a chemical dependency counselor with the department. Ruppert, Hunter, and Birkholz made the joint decision to seek the Dicks' immediate commitment.

The plaintiffs accuse Hunter and Ruppert of distorting Valerie Dick's statements about them, fabricating evidence against them, failing to corroborate Valerie's information, and presenting information to County Attorney Birkholz in such a way as to cause him to draw up petitions for their commitment. In addition, the plaintiffs allege that Hunter and Ruppert, along with Birkholz, Schutt, and McCarthy, conspired to cause their arrest and confinement as part of an overzealous campaign against alcohol abuse in Watonwan County.[13]

The defendants offer two defenses to the plaintiffs' allegations. First, they argue that the Dicks' confinement was not illegal because the requirements of Minn.Stat.

prosecutorial immunity does not turn on whether proceeding is civil or criminal).

**13.** As evidence of the defendants' alleged campaign against alcohol abuse, the plaintiffs refer to newspaper articles which appeared in the local St. James newspaper shortly before the commitment occurred. One of these articles is an exhibit to the deposition of Jerry Ruppert. The article is dated November 19, 1980, and recounts the talk the Reverend Philip Hansen

gave to a "gymnasium-packed audience" on the subject of chemical use and abuse. *See* Deposition of Jerry Ruppert, Apr. 7, 1982, Exhibit 1. The article also quotes Bill Schutt as saying that "community action 'has the best chance of impacting the drug problem in the community.' ... [I]t is the community that can apply the pressure in the right places to deal with the problem ...." *Id.*

§ 253A.07 were met.[14] Second, they assert that they are immune from liability for damages.

■ The defendants' first defense, compliance with the judicial commitment statute, does not provide a basis for granting their motion for summary judgment because unresolved factual questions exist whether the requirements of section 253A.07 were met. Section 253A.07, recently repealed, *see* note 5 *supra,* required that a petition for commitment be accompanied by a physician's written opinion that the proposed patient is inebriate, or a written explanation why, after reasonable efforts, the petitioner could not obtain such a statement. Section 253A.07 also required a finding of "probable dangerousness" of the proposed patient. *State ex rel. Doe v. Madonna,* 295 N.W.2d 356, 363 (Minn.1980).

It is undisputed that the petitions for commitment of the Dicks were not accompanied by a physician's statement. The unresolved question is whether Hunter and Ruppert made reasonable efforts to obtain a statement. Both commitment petitions state that "Petitioner is unable to procure a physician's statement because Petitioner is unaware of any physician who is sufficiently knowledgeable with the drinking habits of the patient." There is no indication, though, that Hunter or Ruppert made any attempt to determine the name of the Dicks' family physician. The defendants also contend that "exigent circumstances" prevented them from obtaining a physician's statement. The alleged exigency is that the Dicks were planning to attend a dinner party the evening of their arrest at which the defendants expected the Dicks would drink heavily. The Dicks had no previous record of public disorderliness due to alcohol consumption, however. Further,

there is no indication the defendants considered less intrusive means of preventing the Dicks from becoming intoxicated on the night in question before deciding to seek the Dicks' immediate confinement. *See Welsch v. Likins,* 373 F.Supp. 487, 502 (D.Minn.1974) (due process requires that state officials make good faith effort to place civilly committed persons in appropriate settings least restrictive of their liberties). Whether Hunter and Ruppert acted reasonably in petitioning for the Dicks' commitment without first attempting to have the Dicks examined by a physician as required by section 253A.07 cannot be resolved at this stage of the proceedings.

Another unresolved question is whether section 253A.07's probable dangerousness requirement was satisfied.[15] The defendants argue that the requirement was met because Alexander Dick drives while intoxicated. The defendants do not explain how Alexander Dick's driving behavior provided a basis for committing Irene Dick, who does not drive. Moreover, the defendants relied solely on Valerie Dick's statements in forming their belief that Alexander Dick was dangerous. They did not take the simple step of checking Alexander Dick's driving record, which was unblemished. Again, there is no indication the defendants considered less intrusive alternatives to immediate commitment, such as seeking the suspension of Alexander Dick's driver's license. At this stage of the proceedings, it is at least questionable whether section 253A.07's probable dangerousness requirement was met.

Hunter and Ruppert's second defense is that they acted in good faith in petitioning for the Dicks' commitment. The defendants assert that, as county officials, they possess qualified immunity.

14. *See* note 6 *supra.*

15. The Minnesota Supreme Court stated in dictum in *State ex rel. Doe v. Madonna,* 295 N.W.2d 356 (Minn.1980), that Minn.Stat. § 253A.07, subd. 17(d) describes the standard of dangerousness for inebriacy. 295 N.W.2d at 363. That section of the statute, now repealed, stated that commitment of an inebriate person

is appropriate when "necessary for the welfare of the patient or the protection of society."

Under Minnesota's new judicial commitment law, commitment is permissible only after a court finding "that serious imminent physical harm to the patient or others is likely if the proposed patient is not confined." Minn.Stat. § 253B.07, subd. 7(c).

■ Whether county welfare officials are entitled to immunity is a question which has not previously been addressed in this circuit. The United States Court of Appeals for the Fifth Circuit has ruled that the extent to which a state welfare official is immune from suit depends on the amount of discretion and responsibility the official exercises in his or her position. *Slavin v. Curry,* 574 F.2d 1256, 1266 (5th Cir.), *modified,* 583 F.2d 779 (1978); *accord Papenhausen v. Schoen,* 268 N.W.2d 565, 571 (Minn. 1978) ("[S]tate officials are not absolutely immune from suit but ordinarily may be held liable only in the performance of ministerial rather than discretionary duties."). The maximum scope of immunity to which a welfare official is entitled is qualified immunity. *Morrison v. Jones,* 607 F.2d 1269, 1274 (9th Cir.1979) (per curiam), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980).

The plaintiffs have not attempted to argue that Hunter and Ruppert performed only ministerial duties. The evidence suggests that these defendants exercised a great deal of discretion in the performance of their duties. Therefore, Hunter and Ruppert are entitled to the protection of qualified immunity.

■ The defendants' qualified immunity does not mean they are entitled to an award of summary judgment, however. The preceding discussion has shown that a factual question exists whether Hunter's and Ruppert's grounds for believing the Dicks were dangerous and for seeking their immediate commitment were reasonable. A factual question also exists whether Hunter and Ruppert acted in good faith in seeking the Dicks' commitment. Hunter and Ruppert relayed to Birkholz accusations made by Valerie Dick against her parents. Birkholz' version of these accusations differs markedly from the version which Valerie testified she gave Hunter and Ruppert. This discrepancy provides sufficient weight to the plaintiffs' allegation that Hunter and Ruppert in bad faith distorted and embellished Valerie's accusations to preclude granting Hunter and Ruppert's motion for summary judgment on the plaintiffs' section 1983 claim.

■ As to the defendant Bill Schutt, it is true that he did not directly participate in the procurement of the commitment orders. Nevertheless, he was responsible for supervising Hunter and Ruppert. Although the doctrine of *respondeat superior* is inapplicable in section 1983 actions, *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Pearl v. Dobbs,* 649 F.2d 608, 609 (8th Cir.1981) (per curiam), an official who "fails to properly train, supervise, direct or control the actions of a subordinate who causes the injury" may incur direct liability to a plaintiff under section 1983. *Pearl v. Dobbs,* 649 F.2d 608, 609 (8th Cir.1981) (per curiam); *accord McClelland v. Facteau,* 610 F.2d 693, 695–96 (10th Cir.1979). In his deposition, Ruppert testified that it was a common practice of the Watonwan County Welfare Department to seek a petition for commitment in a case such as the Dicks' without attempting to verify independently the information provided by the complaining family member, even where the complaining family member was a minor child. Deposition of Jerry Ruppert, Apr. 7, 1982, at 54–55. This testimony is sufficient evidence of a failure of supervision on Schutt's part to preclude granting Schutt's motion for summary judgment on the plaintiffs' section 1983 claim.

■ The Watonwan County Welfare Department, as the employer of Schutt, Hunter, and Ruppert, is liable only if the acts of those defendants were done pursuant to department policy or custom. *Monell v. Department of Social Services,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978); *Morrison v. Jones,* 607 F.2d 1269, 1273 (9th Cir.1979) (per curiam), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1648, 64 L.Ed.2d 237 (1980). The deposition testimony of Jerry Ruppert, cited above, indicates that Hunter and Ruppert were acting in accordance with department policy or custom in seeking the Dicks' commitment. Accordingly, the Watonwan County Welfare Department's motion for summary judg-

ment on the plaintiffs' section 1983 claim is also denied. The department is not liable for punitive damages, however. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981).

■ The Court must also deny the individual defendants' motion for summary judgment on the plaintiffs' false imprisonment claim. The Minnesota Supreme Court has held: " 'All those who, by direct act or indirect procurement, personally participate in or proximately cause the false imprisonment or unlawful detention, are joint tortfeasors.' " *Kleidon v. Glascock,* 215 Minn. 417, 425, 10 N.W.2d 394, 397 (1943), *quoting Anderson v. Averbeck,* 189 Minn. 224, 225, 248 N.W. 719, 720 (1933). Unresolved factual issues exist concerning the extent of the individual defendants' participation in the procurement of the Dicks' commitment.

4. *Maureen McCarthy and Public School District # 840*

It is undisputed that Maureen McCarthy, Valerie's school guidance counselor, was not present during the discussions at County Attorney Birkholz' office, nor was she present when Birkholz, Hunter, and Schutt made the decision to seek the Dicks' commitment. Nevertheless, the plaintiffs argue that McCarthy "initiated" the commitment proceedings.

■ This argument must be rejected. There is no evidence that McCarthy ever sought the Dicks' commitment. Rather, she contacted Deborah Hunter at the Welfare Department in order to find out about foster care for Valerie. Valerie's own deposition reveals that it was Valerie who first raised the idea of foster care. Deposition of Valerie Dick, May 10, 1982, at 32. The plaintiffs argue that McCarthy encouraged Valerie to fabricate stories about the plaintiffs' drinking by suggesting to Valerie that their drinking could be a basis for providing her with foster care. The plaintiffs have provided no evidence in support of this allegation. Rather, Valerie's deposition indicates that it was she who first mentioned her parents' drinking, although at some

time prior to her December 4, 1980, meeting with McCarthy. *Id.* at 33.

Other considerations weigh against holding McCarthy liable under section 1983. As an official engaged in social services and charged with child care, McCarthy had a duty under Minnesota law to report the suspected neglect or abuse of Valerie. Minn.Stat. § 626.556, subd. 3. In addition, McCarthy is entitled to good faith immunity under federal law. *See Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974). The plaintiffs have provided no evidence, other than the unsupported allegations of counsel, that McCarthy did not act in good faith. The plaintiffs cannot rely on "bare allegations of malice" to defeat the granting of summary judgment. *Harlow v. Fitzgerald,* —— U.S. ——, ——, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In the absence of *any* evidence of a malicious motive on McCarthy's part, the Court must grant her motion for summary judgment on the plaintiff's section 1983 claim.

The same considerations warrant granting McCarthy's motion for summary judgment as to the plaintiffs' conspiracy and false imprisonment claims. There is simply no evidence McCarthy either helped procure, or conspired with the other defendants to procure, the Dicks' commitment.

Since McCarthy acted innocently, there is no basis for liability of her employer, Public School District # 840.

5. *Watonwan County*

■ The law is clear that the plaintiffs cannot recover against the county on a *respondeat superior* theory based on the alleged illegal actions of the county's employees. *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). However, if the individual defendants acted in the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent an official policy," *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38, the county may be liable. Sufficient evidence exists to indicate that Hunter and Ruppert acted in accordance with official policy or custom.[16] In his deposition, Jerry Ruppert admitted that it would be a common practice of the Watonwan County Welfare Department to seek a petition for commitment in a case such as the Dicks' on the basis of unverified statements of a minor child. Deposition of Jerry Ruppert, Apr. 7, 1982, at 54–55. Accordingly, Watonwan County's motion for summary judgment is denied. The plaintiffs' claim for punitive damages against the county is dismissed. *City of Newport v. Fact Concerts,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981).

IT IS ORDERED that, as to all claims in the plaintiffs' amended complaint, the defendants' motions for summary judgment are granted as to Sheriff Engdahl, County Attorney Birkholz, Maureen McCarthy and Public School District # 840.

IT IS FURTHER ORDERED that the motion for summary judgment of the Watonwan County Welfare Department, Bill Schutt, Deborah Hunter, and Jerry Ruppert is denied as to all claims in the amended complaint except that the motion is granted as to the claim for punitive damages against the Watonwan County Welfare Department.

IT IS FURTHER ORDERED that the motion for summary judgment of Watonwan County is denied as to all claims in the amended complaint except that the motion is granted as to the claim for punitive damages against Watonwan County.

---

16. Watonwan County contends that it cannot be held liable for the acts of Hunter and Ruppert because those defendants were not employed by Watonwan County. The county has supplied an affidavit by County Attorney Birkholz which states Birkholz' "opinion" that Ruppert and Hunter were not employees of Watonwan County, but rather were employed by the Tri-County Human Services Board, an allegedly independent entity created by a contract between Faribault, Martin, and Watonwan Counties pursuant to Minn.Stat. §§ 402.01–402.10. The Watonwan County Welfare Department has never denied that its personnel are county employees.

Although Hunter and Ruppert technically may have been employed by the Tri-County Human Services Board, this does not mean that the county can incur no liability for their acts. The statute makes clear that the Human Services Board is funded by the participating counties, Minn.Stat. § 402.02, subd. 3, and that the boards of commissioners of the participating counties must approve the Board's budget, Minn.Stat. § 402.065. Further, the document creating the Tri-County Human Services Board states that "[a]ll policy, administrative, staffing and budgetary decisions of the Board are open to the review and comment of each of the participating county boards." Affidavit of Daniel A. Birkholz, Exhibit A, at 3. The county's financial and supervisory relationship to the Board provides a sufficient basis for holding the county liable for the acts of the Board's employees.